UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 11 CR 61 |
| | ) | |
| ANTONIO WEST, | ) | |
| | ) | |
| Defendant. | ) | |

# **MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

The defendant Antonio West has filed a Motion to Suppress Evidence on the basis that the searches conducted by police officers resulting in the seizure of evidence to be offered at trial and any statements made by the defendant around the time of the search and seizure were the product of constitutional violations. The Government's Answer to the Motion denies the assertions made. Because of the fact questions raised by the parties' submissions, an evidentiary hearing was held on December 11, 2012 and January 15, 2013 in order for the Court to hear evidence necessary to decide Defendant's motion.

After the evidentiary hearings were completed, each side was afforded the opportunity to submit briefs in support of its position. The Court has reviewed these submissions. In addition to those submissions, the Court has relied on the testimony received at the hearing and the exhibits admitted. In addition to testimony and

exhibits received in evidence at the hearing, the Court has also reviewed affidavits and medical reports bearing on the issues presented.

Defendant West's motion asserts violations of both his Fourth and Fifth Amendment Constitutional rights. In his post evidentiary hearing memorandum, West asserts that four issues remain to be decided:

1. Was West given his Miranda warnings before being questioned?

2. Did the police have probable cause to arrest West, or have an articulable suspicion to detain West when he entered the apartment at 1332 W. 92nd Street in Chicago?

3. Did West have a sufficient understanding of the consent to search form to knowingly and intelligently waive his right to be free of a search without a search warrant?

4. Was the consent to search obtained prior to the search of the Loomis street residence?

On June 3, 2010, Officer Michael Carroll testified that he and his partner, Everado Bracamontes, were on the south side of Chicago in the afternoon as part of a South Saturation Team. The two received a radio call that a number of male Blacks were seen carrying large-screen televisions in the area of 1330 W. 92nd Street. Shortly before this call, another call had been received concerning a house burglary involving two stolen television sets.

The officers observed a number of men at the 1330 W. 92nd Street location with one of them, the defendant West, carrying a television set. Carroll and Bracamontes followed the men into the apartment. In short order, all of the men in the apartment, including West, were placed in handcuffs.

Other police officers arrived and assisted in the cuffing of the men. West was escorted outside while the victim was brought to the scene in order to identify the television. West was told he was under arrest for possession of a stolen television. At this point, Officer Carroll read to West his Miranda rights from a preprinted card. West stated that he understood his Miranda rights after he heard them and did not ask any questions about them. West did not appear to be confused, intoxicated, or otherwise unaware or uncomprehending of his circumstances.

Officer Carroll then had a conversation with West. Carroll described West as cooperative. West emphatically denied stealing the television and told Carroll he was simply paid $10.00 by a man to move it. At some point, Carroll began to believe that West did not steal the television, but pressed West for the location of a second television that had been stolen. After being told by Carroll that West would not be charged with burglary if he would help the victim get his stuff back by telling him where the other television was, Officer Carroll asked West for consent to search his house. West was given the consent to search form and was told it would allow the police to go into his house and get the TV for the victim. West read the form, read parts of it aloud to himself, and was told he did not have to sign the form. West was not told he would be arrested for burglary if he did not sign the form. West signed the consent to search form with the time of 16:40 on the form. This activity between West and Carroll took place while the other detainees were still at the scene of 1330 W. 92nd Street with West.

After West signed the form, he told Carroll that the television was in the walk-up attic in the back bedroom of his house. Carroll and other officers traveled to 9238 S. Loomis to search West's house. Carroll found a large-screen television in the attic. About a foot from the television set was an M-1 carbine rifle, the subject matter of the instant indictment.

Sometime later, West and the other detainees were taken to a police station. While there, Carroll testified that he told West he found the TV in the attic where West said it would be, and that West was not going to be charged for breaking into the house and the burglary - as he had promised. He testified he told West he would be charged for possession of the TV's, but they found the "other thing up there" and could not let it go. Carroll said West looked unhappy and told Carroll he knew what he was saying, but that it was a safe place to keep the rifle. Carroll showed West the rifle. Officer Bracamontes corroborated Office Carroll's testimony in its essentials. A third police officer, Mizel Brooks, also testified in a vein similar to Officers Carroll and Bracamontes although Brooks was less involved.

Although he did not testify at the evidentiary hearing, therefore precluding cross-examination by the Government, defendant West submitted an affidavit asserting he made no statement to the police on June 3, 2010, that he did not know or understand what the officers wanted him to sign that day, and did not understand that he was giving them permission to search his father's house. West stated that he believed he was signing a consent to be taken to the hospital. West also denied

having been read his rights at any time on June 3, 2010, that he had no knowledge of any gun in the house, and had never seen a gun there.

I find the testimony of Officer Carroll, corroborated by other testimony and evidence, to be truthful and reliable. Based on the evidence, I find that the initial detention of defendant West was a legally justified action as an investigative stop. It was reasonable based on what the officers heard and saw and it was sufficient to supply reasonable suspicion that criminal activity was afoot. There was a reasonable basis to detain not only West but all of the other men entering the apartment at 1330 W. 92nd Street. The length of the detention was reasonable under the circumstances, as was summoning the victim of the burglary to the scene of the detention.

It is also my conclusion that defendant West was read his Miranda rights prior to his interrogation. West both denies having been read his rights that day at any time, and denies understanding that the Consent to Search Form he indisputably signed was to permit a search of his home. West contends that it was merely to permit transportation to a hospital.

The mental capacity West had to understand any rights given to him, orally and in writing, have been raised as issues in the case. The defendant West was apparently diagnosed with psychiatric issues in his early 20s and had been prescribed a variety of anti-psychotic and antidepressant medications since then. Between 2005 and 2008 West had been hospitalized 18 times. His diagnosis included substance abuse, depression, and antisocial personality disorder.

Dr. Ron Nieberding, a forensic psychologist with the Federal Bureau of Prisons, examined West in an effort to determine whether West was competent to waive his Miranda rights. Dr. Nieberding concluded that "information provided by the defendant suggested that he did not understand the content of the form he signed, nor was this information explained to him . . . (his) description indicated some level of coercion was involved and that his waiver as not entirely voluntary." Dr. Nieberding further opined "due to the absence of collateral information, however, it is difficult to gauge the accuracy of the defendant's version of the circumstances surrounding his arrest or to provide a definitive opinion regarding whether or not he was competent to waive his Miranda rights at that time.

Dr. Nieberding drew his conclusions in his August 14, 2012 report based on what West told him about June 3, 2010.

Dr. Nieberding never read any of the police reports and never saw the document West referred to in West's rendition of the facts. He declined to offer a definitive opinion regarding West's capacity or competence to waive his rights, and even if he attempted to do so, it would not have passed the requirements necessary to be admitted or relied upon as expert testimony. Dr. Nieberding admitted that he had no access to reports concerning the incident at issue, nor could he evaluate the accuracy of West's description of the incident. Any impressions he may have gained were not the product of any scientific or related procedure necessary to the development of an opinion which could be viewed as based on a reasonable degree of

medical certainty.  Any tentative conclusions Dr. Nieberding drew relied on crediting West's version of events as unquestionably accurate.

Dr. Stephen Dinwiddie, Director, Division of Forensic Psychiatry and Law at Northwestern Medical Faculty Foundation, also testified at the hearing on West's behalf.  His commission in this case was to evaluate and determine West's competency to waive his Fourth and Fifth Amendment rights.  This evaluation included interviews of West on two occasions.  Interestingly enough, it was Dr. Dinwiddie's opinion that "it was likely Mr. West could have knowingly, intelligently and voluntarily waived his Miranda rights."  A number of reasons were offered in support of Dr. Dinwiddie's belief of competence as to the Miranda rights.

Incongruously, Dr. Dinwiddie then offered that opinion that "it is highly unlikely that [West] was able to understand the consent to search or comprehend what rights he was relinquishing by signing such a document."  As we know, the Miranda warnings are a multi-layered package of information involving a number of legal concepts which require a number of lines in written form and the equivalent in oral exposition.  The consent form West signed contains three and a half lines, and conveys one concept.  Dr. Dinwiddie agreed that the right not to have premises searched without a search warrant is not a complex concept.

Adding to the incongruity of different conclusions drawn for two Constitutional amendments is the procedure employed by Dr. Dinwiddie when it came to the consent to search issue and West's comprehension.  Dr. Dinwiddie never showed the consent

form to West; he never asked West to read any portions of it; he never asked West for his understanding of his right to refuse a warrantless search of his home; he did not ask West about the consent to search form itself; he did not recall asking West if West understood what was on the form.

For a medical opinion to be received in evidence, the opinion must have been the product of an evaluation and analysis that had a scientific or equivalent underpinning based on the discipline involved. The glaring omissions described, fundamental to a reasonable determination of an opinion which would satisfy the legal test of admissibility, defeats the ability to rely on the opinion expressed.

For the reasons expressed, the Court finds that neither the Fourth nor Fifth Amendment rights of the defendant West were violated. The evidence establishes that the detention of West and the subsequent search of the home where he lived were lawful. There is also no credible evidence to support West's position that his Fourth and Fifth Amendment rights were violated because he was not competent or mentally capable of understanding those rights or waiving them. All other contentions raised in the motion to suppress have been considered and rejected.

_____
Charles P. Kocoras
United States District Judge

Dated:  June 6, 2013